Case No. 23-1483, Jeffrey Franz, et al. v. Oxford Comm School District, et al. and includes 13 additional consolidated and cross-appeal cases. You don't have to read them. Or an argument not to exceed 15 minutes per side. Mr. Chappie for the appellate. Good morning, your honors. Ken Chappie appearing on behalf of the defendant appellants. I would like to reserve five minutes for rebuttal time. Very well. So you're here on behalf of the school officials. Yes. The counselor, Sean Hopkins, and the dean of students, Nick Ejak. All right. Now the district court found, it was correct when it found, that based on the plaintiff's pleadings, that E.C. came to school on the morning of November 30th, prepared to commit a school shooting, and the risk he would do so was a pre-existing danger. After all, they pled that E.C. had been planning this event for eight months before the shooting occurred. They pled that he actually brought a gun with him on the morning of the shooting to carry out this long-standing plan. Based on this conclusion by the district court, the district court should have found this is not a substantive due process. We know, though, that our precedents say this isn't a binary question about whether there was a pre-existing risk or not. And our cases say that if an affirmative act by a government official increases or greatly increases that pre-existing risk, then that can be actionable. And I think that is what they're saying here. I mean, that's their argument. So the mere fact that there, well, not mere fact, but the fact that there was a pre-existing risk does not necessarily defeat their claim, it would seem. Well, Your Honor, when you measure the type of risk that existed before the state action with the risk that existed after the state action, in this case, based on their pleadings, that risk is the same. But it's not about type, either. It could be the same type. It could be the risk of exactly what happened. But if their action, if there's an affirmative action, and there are other requirements, you know, shock the conscience. Right, Your Honor. But as far as this risk business, it can be the exact same type of action. And again, if they greatly increase the risk, then there's potential liability. I just, I don't, I mean, how can, how do you prevail on that as a matter of law here? That, oh, you'd have to show that this was immaterial. That it just had no effect on the person who did this. It didn't get him more wound up. It didn't kind of close the deal, so to speak, in his own mind. And I don't, I'm struggling on this record to see how you could establish that as a matter of law. Well, when you compare this case with, say, Jones v. Reynolds, where it was the drag racing case, there, they hadn't actually started the race. There was a plan to go forward with a drag race. When the police showed up, they actually were abandoning their plan to go forward with the race based on the police's presence. And the police, in that case, actually encouraged them to go forward with the race. And based on that record. I mean, those guys were already there revving their engines, ready to go. You could see how they were going to do this anyway. I mean, you could see, that's a case where you could make an argument that there was an increase. Was not. I mean, they were just going to do it anyway. I'm just saying. I guess the question is, why isn't this that case? Like, he had in his journal, like, at this time tomorrow, I'm going to do this. I have the gun. I have the plan. I have the time. I'm going to go into this bathroom. Like, this is not some whimsy that he thought maybe someday. It was like, now or tomorrow. Yes, Your Honor, I agree. That is exactly. This is just private actor violence. And to go back to the Jones case. The drag racers, as part of the record, had a plan to abandon the race when the police showed up. So there was. I'm sorry. They did? Yes, that's what it said in the opinion. And then the police encouraged them and played music over the loudspeakers to encourage them to go forward. But this case involves eight months of planning. And it involves him, the shooter, telling his friend that he planned to commit a school shooting. He begged his parents for a gun. He wrote in his journal his exact plan to commit this exact type of harm. And as Judge Larson, you just mentioned, he wrote in his journal he planned to carry out that act the next day, which he did. And bringing the gun to school with the intent to carry out a plan with 48 rounds of ammunition, in my mind, is no different than the cars revving their engine ready to get on with the drag race. It is the step before he is actually carrying out his plan. And that risk was the exact same risk before Sean Hopkins pulled in from class on November 30th. And it's the exact same risk that was present the moment he exited Sean Hopkins' office, Your Honor. So based on that risk being the exact same, this is just private actor violence. This is not state action. And as to the conduct that's alleged to have occurred by the counselors, the two defendants, it cannot be conscience-shocking when you see what they are trying to do. They are actually trying to help a child that appears to have some sort of depression. They are, according to them, answering the cries for help by contacting his parents, telling his parents, hey, look, there's some issues here. You need to get them counseling. Even if they go so far as to urge it and go even farther and say you need to do it now or otherwise we're going to contact CPS within 48 hours. You want counselors to try to help, to try to intervene in these types of situations. So we could agree with all of that. But then I still wonder whether if, so this is on the shocks of conscience, if you agree that the counselors inferred a risk of suicide. That's based on their allegations. We take those as true. Okay. So and if they inferred a risk, if they had inferred a risk of homicide, then it would probably shock the conscience to send the kid back to class, right? So isn't the question when you're on the pleadings, how much do you have to show? Can you show on the pleadings that they did not infer a risk of homicide? Or maybe there's another step I'm missing. Well, I think it takes a step back to, say, the Deshaney case where the state was actually aware of the risk of harm of child abuse. And just having that knowledge, that specific knowledge of father and stepmother were that abusive wasn't enough to lead to liability under the substantive due process. So in other words, you think that even if they had subjectively formed an idea that, gosh, this kid might commit a school shooting, and I'm not sure that they did do that, but if they did, that sending him back to class would not be conscience-shocking? Well, I think we look to the pleadings on that, and I don't think that that allegation is actually there. That allegation, the facts establishing that allegation are not actually there. They're saying that there are writings on the math assignment from which one could infer that he was homicidal, not that they actually drew that specific risk. And we look to that Jane Doe versus the case. So how do we do that on the pleadings? I mean, is it the case that, I mean, they do say, I think, they have an allegation, it might be just a naked allegation, that they did draw that conclusion. But, I mean, how on the pleadings do we decide what conclusions they drew, I guess, is my question. I'm sorry, what? On the pleadings, how do we decide what conclusions they drew, or is that something they would need discovery on? I don't think they need discovery on that, Your Honor. I think that they need to actually establish facts establishing that. But on the pleading stage, we can draw reasonable inferences in the plaintiff's favor from the particular facts that the plaintiff alleges in a complaint. And, you know, with regard to that math worksheet, I mean, what he drew there, I mean, don't, I mean, why wouldn't it be a reasonable inference that when you had the depiction of a person who had been shot, along with a depiction of, you know, a handgun, why wouldn't it be a reasonable inference that the school officials would think, this kid, this child might do that to somebody here? Well, Like most favorable, you know? Sure, Your Honor. Yeah, so when you look at the Jane Doe versus Jackson School's case. Well, let's talk about that drawing. Yes. Why isn't that a reasonable inference? Because the drawing itself does not actually state that he's intending to commit a massacre. But it's an inference. That's the nature of an inference. It's implied rather than expressed. Correct, Your Honor. But with the standard being as high as it is under a substantive due process claim, it's not enough to just have facts present from which you could draw the inference. They actually have to establish the inference was drawn. So what would they put? How could a plaintiff plead that, that the inference was drawn, I guess is my question. If there was some facts that they, well, we've gone through a lot of discoveries, the state court claims that are present here as well. And we've had multiple criminal prosecutions. There's been a preliminary examination. Sean Hopkins has testified four different times on the record. And if there was some testimony from him that could have some, if there was testimony from him that said in any of those four times that he testified under the record that he actually drew that inference, that would be enough. But that is not the inference, or that is not what's in the record. How do you distinguish this case from the Lipman case? That's the one with the child protective services that was, a young child that was being abused by her parents. Yes, Your Honor. So the Lipman case is involving retaliatory violence. And Lipman makes clear on pages 767 of that opinion that it creates categories. And Lipman states that that case precisely tracked those cases like Kallstrom and Nelson, where the private actor had no desire to harm the plaintiffs before the state action. But the district court found the exact opposite, that E.C. came to school on the morning of the shooting, prepared to carry out a school shooting. So in Lipman, the parents were abusing the child before. That's how child protective services got involved. So there was some abuse before, then the situation happens with child protective services, and then more abuse after. Yes, Your Honor. Yes, there was a general, they were generally abusive. But the thing about the retaliatory abuse was it depended on the state action. The court stated there that you have to use common sense for those kinds of claims because the county even had a policy preventing that kind of question because of that type of result. And the defendants in that case actually conceded that their actions did make things more dangerous for the plaintiff. But again, the Sixth Circuit, at that part of the opinion, stated that it precisely tracked those cases where the private actor had no intention of harming the plaintiff before the state action, which is just not this case. What's your position as to whether sending this young man back to class after this meeting was an affirmative act for purposes of meeting that requirement of an affirmative action for this substantive due process claim? As Dukowski and Cartwright stated, it is returning the situation back to the status quo ante. And ergo? Yes, Your Honor. Ergo what? Well, so. It doesn't count as an act. It doesn't count as an act because if Mr. Hopkins hadn't done anything at all, he still would have been in class with that plan and with the gun and the .48 rifle. So an act has to be something that actually changes the status quo as opposed to maybe two actions that together just leave us at the status quo. Yes, Your Honor. Any other questions right now? All right, sir. Thank you for your argument. We'll hear from the plaintiffs. Good morning, Your Honors, and may it please the Court. Kevin Carlson appearing on behalf of the plaintiffs in these consolidated cases. At the time of the school shooting, just before the school shooting at Oxford High School on November 30th, 2021, the school officials who are the defendants in this appeal, counselors Ejac and Hopkins, had subjective knowledge of the case. They had subjective knowledge and full appreciation of the dangers they were facing with the shooter. This included knowledge as they – this is not a naked allegation based solely on the most generous possible inference of the pleadings. This is based on their own testimony, which we are aware of from the preliminary examination in a state court criminal case. Well, I mean, okay, I have a technical question for you then. I mean, are we deciding this appeal based on the pleadings or not? I mean, it's a 12C judgment, right? Right. And so you're talking about testimony in some other proceeding? Yeah, our complaint – yeah, correct, Your Honor. The complaint that was filed in the St. Juliana case, which is my primary complaint in the court below, cites in several footnotes throughout the pleadings to the preliminary exam transcript and the testimony of counselors Ejac and Hopkins in that preliminary examination. And that included their admissions under oath in Oakland County Circuit Court that when they asked the shooter, are you a threat to yourself or others, he said no, and they disbelieved him. They've revealed their subjective knowledge that this young man presented a dangerous moment. Well, I guess I'm just trying to kind of do technical housekeeping here. How is it exactly that you think we should go beyond the pleadings themselves in this appeal? Like, what rule of procedure would allow us to do that? Your Honor, I apologize. You shouldn't go beyond the pleadings. The well-pleaded allegations of the complaint, the motion was brought as a Rule 12 motion right out of the gate. Without any opportunity for discovery by any side. And the well-pleaded allegations and all reasonable inferences drawn from the pleadings. No, certainly. So, a long question. Probably the same question. So all this testimony in the state court proceedings, you say we can or cannot look at? Because you just referenced it. Well, to the extent that it is incorporated in the complaint, I think the Rule 12 standard contemplates. Is it incorporated? I didn't really see incorporation like that. I might have missed it. We cite it in footnotes, Your Honor. In the complaint. Okay. Well, we'll take a look at that. I don't mean to detain you on this. Yeah. And that includes, you know, their admission that they drew the inference that he was suicidal. When they say, we asked him if he was a threat to himself or others. He said, no, we didn't believe him. We asked him, how do you explain. But suicide is different than homicide. That's true. We allege in the complaint that based on that admission plus what's in the drawings and the nature of their question. Are you a threat to yourself or others? Caused them to actually draw the inference that he presented a danger of gun violence, of homicidal violence that morning. So, I mean, this, you know, this is a very unusual kind of claim. The substantive due process action. I mean, you have an action that is inflicted by a private actor. Inflicted in the sense of directly. And now, and now, you know, tragically injured parties are suing state officials, school officials. And saying that what happened here is a violent, that their actions violate the federal constitution. I mean, this is, this is not something that's governed by traditional sort of tort principles and gut instincts about who, who did something that was unwise or foolish or whatever. It's a much, much higher standard, as you know. And so you, you have to show an affirmative action on their part that greatly, or it just increases the risk of harm. And also that that action would shock the conscience. So, as to the affirmative action, the, I mean, they argue that returning, like returning the backpack, for example. Or returning him to class. That that's just restoring the status quo. And that seems to be pretty well grounded in our precedent. So I guess as an initial matter, what's your response on that point? As to those actions, those aren't the only ones you allege. But those are some of the most provocative from this sort of, you know, kind of a tort perspective. Which is not the perspective we can apply in this case. And why are, why aren't, I mean, why aren't they correct? Saying those don't count because it's status quo. Your Honor, the reason they're not correct and the reason that it's factually distinguishable from those cases with pre-existing dangers. I think they cited Cartwright and Bukowski in their pleadings. Is because in the status quo, what they call the extant danger status quo. Or the status quo anti the state action. When they approach this student in his classroom, he has literally pleaded for help. He, this is consistent with what we know about from the medical literature. And we cite this in our reply brief to this court. That shooters often signal their intentions and their plannings. And they do so, and they manifest that mindset in various ways. Some of them consistent with a pre-existing plan. He did say help me on the thing. And he says help me on the plan. So the status quo anti the state action is one in which for whatever reason. This shooter is taking his eight months of journaling. Which for the record is not part of the pleadings in the detailed sense that Mr. Chappie articulates. Wait, so you're saying we can't look at the journal? I thought you referenced the journal in the complaint. There are some complaints which reference the journal. But not to the full extent of the details characterized. But if you reference a contract in just one clause, we can read the whole contract. So why can't we read the whole journal? Your Honor, I assume that that would be plausible. It's not attached to any exhibit. It's not entered into the district court record in this case. To the extent that it's incorporated into the pleadings, it's argument by my opposing counsel. As to why the pre-existing danger overwhelms the impact of any arguable affirmative act. But the act here was one of surrender. The thoughts won't stop. Please help me. Not just a reasonable inference. The only reasonable inference from that is that this is a child in severe distress. He was already in severe distress. I guess what did they do to make that worse? Well, first of all, when he pleads for help and they bring him to the office. They put him under this microscope and they interview him with his parents. And when they ask him, you know, please explain the drawings and tell me what's going on with you. They said and we pleaded that his mood demonstrably changed right before their eyes. He went from trying to be as compliant and cooperative as he would be to being demonstrably sad. The parents arrived. They said they've never seen anything like it. This is pleaded in the record. They've never seen anything like it. They didn't hug the child. They didn't show him love. They didn't offer to take him home with them. Even when the school counselor said you should take this kid home. I mean, this kind of somewhat supports their insistence that you get this kid some counseling or we're going to call child protective services. That's correct. It's support. I mean, it makes that look more reasonable. It makes it look reasonable. But the act of knowing this much about a child who is so activated and clearly demonstrated to you. Obviously, it's a terrible situation. We got that. This is more prosaic. Giving him back the backpack and sending him back to class. I mean, just those two actions would seem not to count here because status quo ante was he had the backpack and he was going to classes. I'm just trying to be clear about what actions we may consider for purposes of increasing risk and conscience shocking in which ones we can't. And I'm trying to give you a chance. Anyway, I'm very skeptical that giving back the backpack and sending back to class count. I just want to give you a chance to speak to it. In an overarching fashion, it goes without saying that evaluation of those affirmative acts and their effect on the level of danger as it presented itself. The danger, as we argue, was not a fixed static amount of danger. It's like a sine wave. It goes up and down. It ebbs and flows within the moment of a kind of dynamic situation. By the time they give him the backpack, they return the backpack to him. They've learned all kinds of distressing things. The drawing of the body and the words on the homework. But this is all just about negligence. It really is. It seems like what you're really driving at is that their actions in the meeting itself, not returning the backpack. I'm not talking about that. I'm not talking about returning them to class. That what they said to his parents was a provocation, specifically the warning that if you don't get this kid some kind of therapy or whatever it is in 48 hours, we're going to call CPS. I can see how that is an affirmative act. Are you saying that's an affirmative act? That is an affirmative act. That increases the risk? I guess I don't know how it would increase the risk, assuming we can look at the journals and everything, that has a very, very detailed plan. It seems to me that this kid has a very detailed plan and he's very, granted, he's very unstable. But just about anything, if you're very unstable, anything they might have said could have upset him. So how did it dramatically increase the risk? I guess that's what I don't know. He had a plan. Because at the moment when it happens, and this applies across all the affirmative acts, the threat to call CPS, the returning of the backpack, and sending him back to class, at that time they've learned... Just pulling him out of class might have really upset him. That's true, except... So then they're just definitely liable. Like, unless they left him in class, they're liable as a matter of law. Because anything they might have said, pulling him out of class, anything they might have done, could have upset him and therefore, you know, triggered him to actually go forward? No, at that point, with regard to the... No, there still has to be an element of danger creation, and there still has to be a subjective amount of knowledge, which we've pleaded in the complaint, that they knew of the clear and present danger that was staring them right in the face. But what distinguishes this case from Doe and from MJ and from McQueen is that in those cases there was no detectable sign that the student in Doe, for example, had or was interested in guns. This student is drawing it all over his paperwork, and he's literally pleading to these adults for help. He wants to be taken... It's negligent. He wants to be taken away and separated from the situation. It's totally negligent. But in addition, it's not mere failure to act in the face of a foreseeable risk. It's the fact that you would give this kid... He's literally separated from the instrumentalities of... I think you have a problem with the case law on this point. Of the danger. I think you have a real problem with the case law on that point, about giving him back-to-back. I kind of... Anyway. Your Honor, sir, in terms of the case law, Doe would have been clearly different, clearly and obviously different, if the fifth grader who is disciplined by the school for lighting matches on the back of the bus upon being moved to the front of the bus in proximity to vulnerable kindergarten students had handed either the bus driver or the superintendent of schools a note and a drawing depicting graphic images of sexual assault and saying, the thoughts won't stop, help me. The student in McQueen v. Beecher Schools, who committed a shooting while his teacher had stepped out of the class to deal with other students who were unruly in a line in the hallway, would have been a much different situation if before he committed the shooting he had gone to the principal's office and said, the thoughts won't stop, help me. In MJ... I guess I don't know. Let's put aside the two affirmative acts that Judge Cutledge is worried about, the backpack and the returning to class. Let's talk about the conversation about we're going to report the parents to CPS. How is that particular conversation, how does that increase the risk? And is it because of the words they said, or is it just because some words they said upset this child? Like they might have said, we think you're very troubled, we think you're displaying risks of suicide or homicide, and that might have also upset him. It feels to me like any words they might have said could have upset him. So tell me why I'm wrong. Well, I can't say that you're right or wrong because we haven't done the discovery to that extent that would be required to answer that very difficult fact question. I don't think we're putting... How is it conscience-shocking? I mean, any of the acts, how are they conscience-shocking? And how do we look at that? Is that a question of law? Sure. So conscience-shocking is generally a question that is highly specific to the factual circumstances. Specific, just like a Fourth Amendment reasonableness determination. Yeah, Doe gives us some constraints. I mean, Doe says that the type of risk, the kind of risk subjectively appreciated by the officials shall determine the type of response that the Constitution requires. That's the language from Doe. And Doe also speaks of a spectrum of culpability. We agree that negligence on the low end of the spectrum will never be conscience-shocking. We also agree with the Court's precedent that actual intent to injure by state officials is at the higher end of the spectrum but isn't necessary. There was no such intent here. Would you agree with that? I cannot see any reason why these people would intend to cause a school shooting. I appreciate that straight answer. That does not make sense. But what about Judge Mathis's question about... I mean, like conscience-shocking, a traditional formulation actually from one of our Doe cases. It applies only to the most egregious official conduct, conduct that is so brutal and offensive that it does not comport with traditional ideas of fair play and decency. I mean, there's many formulations of this.  But it only... I mean, there has to be a malignance, really, you know? And is there any... I mean, can we infer bad faith on their part, that they're trying to mess with this young man as opposed to trying to help him with regard to this threat about child protective suits? I don't know if we can determine bad faith. What we know from the case law is that the indicia of deliberate indifference are dictated by the type and degree of subjective knowledge in the mindset of the state officials at the time they take their action. They have time to deliberate and make a decision about what they're going to do. And in this case, we've alleged that they knew there was a high degree of danger of a suicide. It's similar to the Eighth Amendment cases pre-Brauner, where a jail official would have to be shown to have subjective knowledge of a strong likelihood of suicide. There is a deliberate part, and that's a really good point. Because, frankly, I mean, this is sort of like a custodial setting. I mean, that deliberate indifference standard, it's kind of a strange fit for this shocking the conscience because brutality, you know, that's different than I'm just, I don't really care, you know. In a more recent case... But it does apply. Post-Brauner, there's a case by this court from 2023 or 24, Lawler v. Hardeman County, Tennessee, where they cite the cases pre-Brauner and they say a jail officer would have subjective knowledge, shocking to the conscience, deliberately indifferent to a risk of jail suicide. If an inmate says, I think I might be suicidal, I need some help. Right, I mean, we get those cases all day long. The guy's face down on the mat for four hours and the person watching through the window does nothing. The question is what they knew before they found him. Right, yeah, and they don't go in there, you know, and it turns out he's not breathing. And so there is that deliberate component to actions or omissions in a custodial setting. And I think I can see your point as to why this might be treated as such. But it's not just about deliberation. It's about indifference. And there, again, it's not negligence. It has to be this, like, conscious callousness. Like, I truly don't care if that guy asphyxiates in the next hour. And so when we look at these facts and what these two people are trying to do in that meeting, how, I mean, how really can we infer from the complaint that they don't care? They don't care about the specific risk, which they must appreciate, right? They don't care if this kid goes out and shoots up a hallway. They don't care. And, I mean, that is pretty tough to infer on these pleadings. So I'm giving you a chance to speak to that. It's tough to infer. But it is plausible that one could find it shocking that in the face of what this kid drew on his paper that day. I get that. But that's just generalizing again, all right? I mean, the shock to conscience standard is sort of an embarrassment as a legal rule. And courts have refined it to things that are more concrete that make this less an I-know-it-when-I-see-it kind of a determination and more of a legal one. And the legal deliberate indifference standard is one of those. And it requires what I said, like this real indifference, callousness, I don't care. I see the risk, and I don't care if it happens. And I'm focused on that, not whether this whole thing is shocking. Of course it is. But whether we could infer from this complaint that these two people, when they say your kid needs help, you better get help in 48 hours, or else we're calling the state to get him help. When they say that, they really are indifferent as to whether he would do what he, in fact, did. How in the world can we infer that? Yeah, because, well, I mean, listen. I agree with you, Your Honor. On the other end of the extreme of the spectrum or the continuum of responsibility, as Doe calls it, somewhere in the middle is the deliberate indifference cases, which Doe says we reserve for a case-by-case basis. We're only on the pleadings at this point in time. And under the very unique and particular facts of this case, when a kid is literally begging for help, and they send him back knowing what they know, asking him if he's suicidal or a threat to others, he says no. And they disbelieve him, which can only mean one thing. They've concluded that this is a very dangerous person. To put him back in the school environment is at least a question of fact as to whether that's conscience-shocking. So now you're back to the affirmative act being returning him to the classroom. Well, in addition to the other affirmative, not exclusively, Your Honor, no. In addition to, you know. You're saying if they drew the inference that he was homicidal, it would shock the conscience to tell his parents, we're going to report you to CPS. They were going to intervene in your family's life and report you to CPS if you don't get him mental health treatment within 48 hours. That one seems to have very little connection. But I can see how returning, if they drew the inference this kid is homicidal, not suicidal, homicidal, send him back to class. Which is pleaded in paragraph 135 of our complaint based on these circumstances. But I don't know that they drew the inference. But if, yeah. Your Honor, I'm well past my time unless the panel has any questions. Well, OK. You're OK? I'm done. Mr. Carlson, if you want to take 30 seconds to wrap up however you see fit. Your Honor, I appreciate the extra time. This case comes to the court before we've had any opportunity to explore through discovery or notice a single deposition to determine the full extent of the subjective knowledge and objectivity of any actions that were taken in real time at Oxford High School on November 30, 2021. This case is distinguishable from this court's prior case law in school settings. Because unlike the students in Doe, in McQueen, and the perpetrator Hendon in MJ, the student revealed his intentions and his mindset and his willingness to get help from the state actors before they decided to take any of the affirmative acts in this case, including threatening to intervene in his family life to send him to CPS or by returning him with the weapons and instrumentalities of the crime to class. Very well. Thank you, sir. We'll hear rebuttal. Thank you, Your Honors. Judge Larson, as you noted, anything said to an unstable person may set them off. Even the statements that Mr. Carlson was just reading off that allegedly set off the shooter in that meeting didn't have anything to do with telling his parents that they were going to contact CPS if they weren't securing counseling services for their son. It was the simple act of sitting down with the shooter and saying, what do you mean by these words? That is what he's saying set him off. At that point in the complaint, that is essential to the school counselor role. They want to find out what it is is wrong with the child. And if we're going to restrict them from doing so and say that it's a conscious, shocking, egregious act of brutal proportions, then we're not going to service our children well in schools. And to go to the point of the journal as it is pled in the complaint, it says, first off, and this is from the Watson complaint, paragraph 76, first off, I got my gun. Second, the shooting is tomorrow. And it goes into great detail about what is contained in that journal. Are you talking about the complaint? Yeah, the complaint from the Watson case. The Watson case? Yes. That is not the case we're hearing today. It's one of the 13 consolidated cases. Oh, I'm sorry. I apologize. I'm used to the first name. I do apologize. It's paragraph 76 in the Watson?  It says 76. In part, the journal stated, quote, first off, I got my gun. It's an SP200 Zig Zauer 9mm. Second, the shooting is tomorrow. I have access to the gun and ammo. The journal also contained two distinct drawings of bullets. One of the drawings was labeled, quote, 22, and the other was labeled, quote, 9mm. The drawing labeled 22 contained the following description, kill range 25 max. It goes on from there. Yeah, I mean, I guess these cases are consolidated. But if one plaintiff has a certain allegation and another doesn't, I don't know if we can hold it against the other. Sure, Your Honor. Wait, do you have an answer to that? Because that was going to be my question. Can we? Can't we? Well, as per the lower court, that's how the district court was. The district court consolidated all these cases for consideration, because the facts are almost identical in all of these complaints. I mean, we review the court's work. And why is it OK to hold one person's allegation against another individual? It's a fair enough observation, Your Honor. OK, well. But for the most part, every one of these complaints alleges the same kind of premeditation, the fact that he brought a gun to school that morning for the purpose of carrying out this act. If the court has any questions, otherwise. OK. We thank you both for your arguments. You both have done an exceptionally good job on behalf of your clients. And you've helped our process. And we thank you for your arguments this morning. The case will be submitted.